

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

**NO. 02-10-00045-CV**

JPD GUAM COMPANY, INC. AND                                    APPELLANTS
JOHNNY C. REYES

V.

DEMETRIUS A. REYES                                            APPELLEE

----------

FROM THE 78TH DISTRICT COURT OF WICHITA COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### I. Introduction

In one issue, Appellants JPD Guam Company, Inc. and Johnny C. Reyes
(collectively, JPD Guam) appeal the trial court's judgment for Appellee Demetrius
A. Reyes on JPD Guam's breach of fiduciary duty claim.  We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## II. Factual and Procedural Background

The sole issue before us is whether Demetrius, Johnny's nephew, owed a fiduciary duty to JPD Guam and Johnny, JPD Guam's president, in the sale of three tracts of real property.

JPD Guam and Johnny sued Demetrius for breach of fiduciary duty, fraud, fraud in real estate transaction, fiduciary self-dealing, and unjust enrichment. At trial, Johnny argued that he had agreed to let Demetrius sell the three tracts for 10% of the tracts' sale prices as a finder's fee, and Demetrius countered that JPD Guam's sales of the property to him were arm's-length transactions. There were no written agreements between JPD Guam and Demetrius with regard to any commission or finder's fee. The trial court ordered that JPD Guam take nothing on any of its claims and made the following findings of fact pertinent to JPD Guam's sole issue on appeal:

> 1. Demetrius A. Reyes was not an agent of JPD Guam Company, Inc. or of Johnny C. Reyes in regard to any of the transactions at issue in this case. Demetrius A. Reyes did not agree to act as an agent for JPD Guam Company, Inc. in regard to any of the transactions at issue.
>
> 2. A formal or informal fiduciary relationship did not exist between Demetrius A. Reyes and JPD Guam Company, Inc. or Johnny C. Reyes in regard to any of the transactions at issue in this case. Demetrius A. Reyes did not owe a fiduciary duty to either JPD Guam Company, Inc. or Johnny C. Reyes.

The trial court then concluded that Demetrius did not breach a fiduciary duty to either JPD Guam or Johnny as to the transactions at issue. This appeal followed.

2

## III. Fiduciary Duty

In this factual sufficiency challenge, JPD Guam complains that the trial court erred by determining that there was no fiduciary duty between the parties based on agency, arguing that the record contains multiple instances of Demetrius acting on behalf of and under the control of JPD Guam in the course of selling the real property at issue.

### A. Standard of Review

Findings of fact entered in a case tried to the court have the same force and dignity as a jury's answers to jury questions. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). The trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence to support them by the same standards that are applied in reviewing evidence supporting a jury's answer. *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex. 1996); *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex. 1994).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). But when, as here, the party with the burden of proof appeals from a failure to find, the party

3

must show that the failure to find is against the great weight and preponderance of the credible evidence. *Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646, 651 (Tex. 1988); *see Gonzalez v. McAllen Med. Ctr., Inc.*, 195 S.W.3d 680, 681–82 (Tex. 2006). When conducting a factual sufficiency review, a court of appeals must not merely substitute its judgment for that of the trier of fact. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). The trier of fact is the sole judge of the credibility of witnesses and the weight to be given to their testimony. *Id.*

## B. Agency

To prevail on a breach of fiduciary duty claim, a plaintiff must first prove the existence of a fiduciary relationship between the plaintiff and the defendant. *See Lundy v. Masson*, 260 S.W.3d 482, 501 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). "[A] fiduciary duty arises out of agency law based upon a special relationship between the two parties." *In re Bass*, 113 S.W.3d 735, 743 (Tex. 2003) (orig. proceeding) (citing *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 200 (Tex. 2002)); *see also Shands v. Tex. State Bank*, 121 S.W.3d 75, 77 (Tex. App.—San Antonio 2003, pet. denied) (stating that an agency relationship creates a fiduciary relationship as a matter of law). An agent is a person who is authorized to act for another and is subject to the control of the other. *SITQ E.U., Inc. v. Reata Rests., Inc.*, 111 S.W.3d 638, 652 (Tex. App.—Fort Worth 2003, pet. denied) (noting that agency is generally a question of fact and that the trial court, as factfinder, was free to resolve any inconsistencies in the conflicting

4

testimony to support its implied finding of agency). "Texas law does not presume agency, and the party who alleges it has the burden of proving it." *IRA Res. Inc. v. Griego*, 221 S.W.3d 592, 597 (Tex. 2007); *Tex. Cityview Care Ctr., L.P. v. Fryer*, 227 S.W.3d 345, 352 (Tex. App.—Fort Worth 2007, pet. dism'd) (same).

## C. Evidence

The three tracts of land at issue in this case are (1) a 6-acre tract sold by JPD Guam to Demetrius, who then sold four of the acres to the Burkburnett Independent School District (the BISD property); (2) an 11.6-acre tract sold by JPD Guam to Demetrius, who then sold it to SKB Energy LLC (the SKB property); and (3) a 17.522-acre tract sold by JPD Guam to Demetrius, who sold it to Trinity Hughes LLC (the Trinity Hughes property).

Demetrius, age forty-five at trial, had taken some business and real estate classes at a junior college but did not yet have a real estate license during the transactions at issue. His prior real estate experience involved a residential home construction and remodeling business—PennRey Homes—that he started in the mid-1990s. Demetrius said that prior to the BISD transaction, neither he nor any entity that he had worked for had ever sold or been involved in the purchase or sale of land for commercial use. Demetrius compared his knowledge of commercial property to Johnny's as "zero to one hundred," and Johnny acknowledged having considerably greater real estate experience than his nephew.

5

By trial, Johnny, age sixty-nine, had spent eleven years in the military as a data analyst and then spent the subsequent years building up his property development business. JPD Guam started operating in 1985; Johnny had been its president since 1991 or 1992.

Johnny testified that JPD Guam, which has held assets of around $20 million, buys land for development into commercial or residential property; that it develops land for hotels, high-rise condominiums, and golf courses; and that it has done business in Guam, Hawaii, and foreign countries.[2] Johnny's old business card from around 1985, with his title "President," was admitted in evidence. It lists, among eight others, the following companies: "Tonko Reyes, Inc."; "JPD Guam Co., Inc."; "RUCR Tex. Co., Inc."; "RUMC, Inc."; and "UCRC, Inc." Johnny testified that Tonko Reyes, Inc. built retail shopping complexes and that RUMC, Inc. and UCRC, Inc. were real estate businesses.

Johnny testified that prior to November 2002, he felt that he and Demetrius were close, that he could trust Demetrius, and that he relied on Demetrius to be truthful during their transactions. Demetrius testified that he and Johnny did not have a close relationship and that during the time period at issue here (2000–2005), he "[f]elt it was more business than anything." Johnny's wife Kathrina was designated JPD Guam's corporate representative during the trial.

---

[2]At the time of the trial, JPD Guam owned only one condominium.

6

## 1. Events Prior to and During 2000

In 1991, RUCR Tex. Co., Inc., a corporation owned in part by Johnny and his brother Joe—Demetrius's father—acquired an 86.937-acre tract in Wichita County that included the three tracts at issue here. JPD Guam financed the construction of utilities, streets, and other infrastructure on RUCR's land, and from 1991 to 2002, RUCR tried to develop and market this property.

Demetrius wanted to acquire all of RUCR's property. In 2000, he bought 30.913 acres of the property from RUCR for $170,000, after negotiating with Johnny and offering what his father told him to offer.

## 2. Events in 2002

In March 2002, Demetrius and Johnny, acting for JPD Guam, entered into a contract for sale of RUCR's remaining property, including the three tracts at issue here, for $175,000.[3] The contract's closing date was August 1, 2002. Demetrius testified that he negotiated with Johnny through his father.

In April 2002, Demetrius had some of the property appraised to determine its market value. The appraiser concluded that the value of the 12.29-acre tract adjacent to the John G. Tower Elementary School was $153,600, or approximately $12,500 per acre. The same appraiser estimated the market value of an additional 29.6 acres—three tracts located near Interstate 44—was

---

[3]Johnny did not sign this sales contract, but he initialed the bottom of each page. The sales price included a note for $87,500 payable to Johnny in three annual installments.

7

$444,000, or $15,000 per acre; he billed Demetrius $985. Demetrius never told Johnny or anyone from JPD Guam about the appraisal, and Johnny was unaware of the appraisal during the sale of all three tracts at issue here. However, Johnny acknowledged that he knew how to obtain property appraisals and that he had done so over the years for other property.

In June 2002, JPD Guam foreclosed on RUCR's note and obtained RUCR's remaining 34.195 acres via trustee deed.[4] Billy Elder, a Wichita County attorney, was RUCR's bankruptcy trustee. On June 14, 2002, Elder sent Johnny a letter setting out the following:

> Pursuant to your instructions I have foreclosed on the property owned by RUCR Tex Co., Inc., in favor of JPD Guam Company, Inc. ("JPD"). Enclosed you will find a copy of that Foreclosure Sale Deed. *Therefore, for you to sell this property to Dee, the Contract must be signed by JPD rather than RUCR Tex Co., Inc*. For that reason I am enclosing three (3) copies of an Unimproved Property Contract which must be initialed by you on each page and signed on the last page by you as President of JPD. Please sign these Contracts and return them to our office as soon as possible so that Dee can get his loan approved and we can set up the closing. [Emphasis added.]

Johnny was Elder's client at the time. Demetrius and JPD Guam entered a new contract with the same price ($175,000) and terms as the original contract and with the same August 1, 2002 closing date. The contracted-for property had the

---

[4]Johnny testified that he asked JPD Guam's board—which he said was, at the time, him, his partner, and a Japanese firm—for permission to buy the land and that the property's asking price was $300,000, but he paid only $195,000.

8

same legal description as the 34.195-acre property foreclosed upon by JPD Guam.

Johnny testified that there were no negotiations between him and Demetrius involving RUCR's land and that he was not involved in the earnest money contracts for it, but he also stated:

> Billy [Elder] always told me that Dee is trying to buy the property. I said okay. Now, yes, I signed this [Defendant's Exhibit 4, the earnest money contract] because Billy wants me to sign the documents because Dee wants to take it to the finance to— company to get his money to buy it.

Johnny acknowledged that his signature was on Defendant's Exhibit 4 and that, by signing the earnest money contract, JPD Guam was agreeing to sell all of the land to Demetrius for $175,000.

On June 26, 2002, Johnny sent a letter to Elder stating that the "enclosed documents have been signed and forwarded for you and Dee" and that Johnny would be forwarding the directors' resolution on the sale per Elder's request. Johnny said that he did not present the earnest money contract to JPD Guam's directors to approve its terms; however, on July 1, 2002, Johnny sent Elder a fax entitled "Resolution," with an attachment stating,

**RESOLUTION OF BOARD OF DIRECTORS OF
JPD GUAM CO., INC.**

**RESOLVED**, that Johnny C. Reyes, the President of JPD Guam Co., Inc., authorized in the name of and for the account of this Corporation and such terms and conditions as he may deem proper for the sale of a tract of UNIMPROVED PROPERTY, out of A.R.

9

Collins Survey, Abstract No. 414, Wichita County, Texas.[5]  To do and perform all acts and sign all agreements, obligations, pledges, and/or other instruments necessary or required by all agreement transactions for its protection in its dealing with this Corporation.

**RESOLVED, FURTHER**, that any interested buyer be furnished with a copy of these resolutions, and it be authorized to deal with the officer herein above named under said authority until expressly notified in writing to the contrary.

The resolution is signed by Lawrence J. Teker, Secretary, on June 25, 2002. Johnny testified that Teker was an attorney.

Demetrius testified that after entering the earnest money contract, he tried to find buyers for the property by contacting all of the realtors he knew to tell them about the property.  Paul Harris became Demetrius's realtor for the BISD property.  Demetrius asked Harris to contact Danny Taylor, BISD's superintendant, about the property adjacent to the elementary school.

On July 27, 2002, Harris sent a letter to Taylor that stated that he represented PennRey Homes, "who currently owns the 12.29-acre tract of land directly south of John Tower Elementary and adjacent to Hooper Road," and that PennRey Homes proposed to sell the land to the school district for $175,000, or divided for $17,500 an acre, with a 6-acre minimum.  Below Harris's signature, Demetrius signed the letter for PennRey Homes.  Demetrius testified that Harris

---

[5]All of the land at issue here is out of the A.R. Collins Survey, Abstract No. 414, Wichita County.

sent the letter to Taylor on Demetrius's behalf, even though PennRey Homes did not yet own the 12.29-acre tract at the time.[6]

Demetrius's earnest money contract with JPD Guam expired on August 1, 2002, when he could not find the money to complete the transaction. However, on August 9, 2002, Harris sent another letter to Taylor, stating that "Mr. Reyes" proposed to sell approximately 4 acres to the school district at $17,500 per acre, for a total price of $70,000. A handwritten note on Harris's letter indicates that the school district's board of trustees approved the purchase on September 19, 2002.

Dennis Probst, an engineer and surveyor, testified that Elder called him on September 30, 2002, and ordered a survey of the 6-acre tract that included the BISD property. Probst met with Harris and Demetrius to establish the property's exact dimensions, and they tried to configure the property "in the best way to not impact the rest of the property unfavorably."

JPD Guam offered, and the trial court admitted, the September 30, 2002 minutes from JPD Guam's shareholders' annual meeting. The "Shareholders Present" section reflects that Johnny, as president, and Kathrina, as secretary,

---

[6]Taylor testified that BISD's board of trustees rejected the initial offer because BISD could not buy all twelve acres.

11

were present, as well as Daniel Reyes by proxy.[7]  The minutes, which Johnny testified were prepared on September 30, 2002, state that

> [t]he President informed the stockholders that the Corporation's R-2 lot consisting of 12 acres in Wichita Falls, Texas, of which 6 acres is under consideration for sale to John Towers School for $50,000 as suggested by Dee Reyes reflecting the current fair market value. Johnny Reyes made an agreement with Dee Reyes, nephew, to sell the property and offered him a finder's fee of up to 10% of the value since he is not a licensed real estate agent.  Although Dee Reyes is not a licensed real estate agent, he has a builder's business license under Penn[R]ey dealing with buying and selling houses and property.  He builds new houses and refurbishes dilapidated houses for resale. The target date will take place sometime in November or by the end of the calendar year.

In November 2002, Elder sent Johnny a letter enclosing a warranty deed for two tracts of land from JPD Guam to Demetrius Reyes d/b/a PennRey Homes.  The letter states, "It is our understanding that you will execute this Deed and any consideration to be paid you for such will be handled outside of our office after Demetrius Reyes sells the properties."  Handwritten, below the signature line, Elder wrote, "Dee said he has talk [sic] to you about this."

On November 25, 2002, Johnny, on behalf of JPD Guam, executed a deed for two tracts of land—a 4-acre tract and a 2.02-acre tract—to Demetrius and PennRey Homes.  Demetrius testified that he paid JPD Guam $55,000 for the property.  Elder said that there was no formal closing from JPD Guam to Demetrius on this property and that that there was no settlement statement for

---

[7]The minutes reflect that Johnny held 199,998 shares, Kathrina held 1,000 shares, and Daniel held 1 share.

the sale from JPD Guam to Demetrius because it was "one of those situations where Dee came in and said, [']Johnny will come in and sign it, just do a deed.[']" Elder stated that he did not know what took place outside of his office, other than that the deed was sent to Guam for Johnny to sign and that it was signed by Johnny.

On December 4, 2002, BISD closed with Demetrius on the 4-acre tract for $70,000. On December 5, 2002, Demetrius received $63,421.12 from BISD and then sent a wire transfer of $55,000 to Johnny. Demetrius received confirmation from the bank that day that the $55,000 had been credited to Johnny's bank account in the "branch in [T]amuning[,] [G]uam," and the bank's confirmation was entered in evidence.

Demetrius testified that JPD Guam and Johnny did not complain about the $55,000 purchase until Johnny filed the lawsuit.[8] Johnny testified that, to his knowledge, he had never received the $55,000 wire transfer, and Kathrina testified that she could not confirm receipt of that money and denied that they had received it. However, Johnny made the following allegation in paragraph 8 of his original petition:

---

[8]The September 20, 2003 minutes from JPD Guam's shareholders' annual meeting, admitted as Defendant's Exhibit 25, noted, "The sale of the 6 acres in Wichita Falls, Texas to John Tower School has not materialized yet. No word from Dee Reyes." The "Shareholders Present" section is the same as the 2002 minutes, showing Johnny, as president, Kathrina, as secretary, and Daniel Reyes by proxy, with the same share distribution.

13

In November 2002, the Defendant telephoned Mr. Reyes at his place of business in Guam and informed Mr. Reyes that Defendant had secured a Buyer for the Plaintiff's property *for a sale price of $50,000.00*. Defendant informed Mr. Reyes that Plaintiff would need to sign a Deed conveying title to the property to Defendant in order to facilitate the sale. Defendant forwarded to Mr. Reyes in Guam closing documents for Mr. Reyes to sign. *Mr. Reyes signed the closing documents on Plaintiff's behalf, selling the property for $50,000.00. Afterward, Plaintiff received the $50,000.00 sale proceeds*. Mr. Reyes requested copies of the closing documents, but has never received them. On information and belief, Plaintiff represents to the Court that the Defendant intentionally misrepresented the terms of the sale to Mr. Reyes[] and conveyed only 4 acres of the property to a third party Buyer in this transaction. [Emphases added.]

During cross-examination, Johnny said that the statement in his pleading about receiving the sales proceeds was probably incorrect; on redirect, he stated that he had not been able to verify the deposit yet but acknowledged that he probably did receive payment. Kathrina testified that the pleading was based on a chronology that she had prepared for their first attorney in this case.

Johnny testified that he was in Guam when Demetrius called him and asked him if he could sell JPD Guam's property for Johnny. Johnny said that he asked Demetrius if he had a real estate license, that Demetrius said no, and that he offered to pay Demetrius 10% as a finder's fee. Johnny admitted that there is no written agreement to document this arrangement. Johnny acknowledged that he could have had Teker, JPD Guam's corporate secretary, draw up an agreement for the parties at any time.

Johnny stated that, with regard to the BISD property, Demetrius called him around the end of July or the beginning of August, told him that he had found a

14

buyer and that he was negotiating, and told him that the property's market value was $50,000. Demetrius never showed Johnny the property appraisal or told him that he was selling the land for $70,000. Demetrius told Johnny that he would send him the warranty deed to sign when Demetrius was ready to sell, that Johnny should sign it but not date it, and that Demetrius would fill in the date at closing.

Demetrius testified that he called Johnny about the BISD property, but he denied that he asked Johnny for permission to sell the property on JPD Guam's behalf or that he acted in any capacity as Johnny's or JPD Guam's agent, and he testified that he did not sell the BISD property on JPD Guam's behalf. Demetrius said that he probably did not tell Johnny or anyone from JPD Guam that he had sold the BISD property for $70,000 and that he did not tell Johnny or anyone at JPD Guam that he intended to combine the 2.02-acre tract with his other property to add an entire row of lots, which he later sold to the Wichita County Board of Commerce and Industry (BCI) for $205,000. After the BISD sale, Demetrius continued to try to work deals involving the remaining land owned by JPD Guam, stating, "I'd go out and make sure all the realtors knew that property was available. And when somebody expressed interest, I'd call my uncle and we'd go back and forth on negotiating a price."

## 3. Events in 2003

In November 2003, Demetrius and SKB Energy LLC, a company represented by Trinity Hughes's chief executive officer Dave Lilley, agreed to the

sale of 11.6 acres—described as Lot 16, Block 4, Guam Estates—from Demetrius to SKB for $120,000, to close on December 15, 2003.

Demetrius testified that he contracted with JPD Guam for the SKB property in late 2003 by calling Johnny. Demetrius described their conversation as, "Generally it would be I'd call him up, ask him how much he wanted for it, he'd give me a price, I'd counter offer, he'd counter offer, and we'd go back and forth until we both agreed on a price." Demetrius stated that this was the same sort of negotiation that went on with regard to the BISD and Trinity Hughes properties and that there was never any discussion between him and Johnny about working for JPD Guam on commission.

Demetrius agreed to pay JPD Guam $75,000 for the SKB property—$50,000 in cash and $25,000 in a promissory note that could be forgiven. On December 5, 2003, Elder's office sent Johnny a letter referencing the SKB property and stating that an original settlement statement, warranty, and promissory note were enclosed; Anne Thompson, Elder's legal assistant, signed the letter.[9] Johnny acknowledged that he signed the settlement statement on the property, which reflects a sale price of $75,000, including a $25,000 loan from seller to buyer.

Demetrius stated that he never told Johnny or anyone from JPD Guam that he had a sale lined up for $120,000. JPD Guam and Johnny did not complain

---

[9]The enclosures were not included in the trial exhibit.

about the sale until 2005, when Johnny filed the lawsuit. Demetrius stated that they never demanded payment on the $25,000 note until filing the lawsuit.

Johnny testified that, as before, Demetrius called to tell him that he was negotiating a deal on the property, "and, you know, he's—he's gonna be buying it for [$]120,000." According to Johnny, he agreed to $120,000, and then Demetrius called him back and said that the buyer only wanted to pay $75,000. Johnny stated that the arrangement between JPD Guam and Demetrius was the same as before: JPD Guam would pay Demetrius 10% to sell the property. But Johnny again acknowledged that they had no writing to memorialize this agreement. As before, Johnny did not know the property's appraisal value.

Johnny gave contradictory testimony about when he found out Demetrius was selling the property for $120,000:

Q. . . . At any point in time did he tell you that he was gonna get—that he had entered into an agreement to sell it for [$120,000]?

A. Yes, in the beginning, you know.

Q. Before the sale consummated, did he ever tell you that he was actually gonna get that much?

A. No.

James Norseworthy, a realtor and real estate broker, testified that he had been involved in the sale of the SKB property and that Demetrius had approached him and some other realtors when Demetrius began subdividing land into three parcels. Norseworthy became the realtor for the SKB property;

17

two other realtors received the other tracts, and they listed all of the tracts around the same time.

Norseworthy initially testified that he "believe[d] [Demetrius] was representing his uncle," before he added, "I'm not for sure, but I think that's the way it was." He then replied, when asked whether Demetrius indicated to him that Demetrius was representing his uncle, "Yes, that's correct." But Norseworthy also stated that he thought Demetrius represented Johnny when RUCR, not JPD Guam, owned the property. After JPD Guam acquired RUCR's land, Demetrius never called Norseworthy to tell him that he was not representing Johnny.

On December 15, 2003, Johnny, on behalf of JPD Guam, executed a deed for 11.66 acres to Demetrius. The settlement statement of the JPD Guam-Demetrius sale shows that Johnny sold the SKB property to Demetrius for $75,000, with a $25,000 loan from seller to buyer. On December 15, 2003, Demetrius made a promissory note payable to Johnny for $25,000. The note contains the following language:

> **NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, IT IS AGREED AND UNDERSTOOD THAT IF ALL OR PART OF LOT NO. TWENTY (20), BLOCK FIVE (5) AND LOT TWENTY-ONE (21), BLOCK NINE (9) OF THE REVISED PRELIMINARY PLAT OF GUAM ESTATES DATED JULY 11, 1994, AS MORE FULLY DESCRIBED ON THE EXHIBIT "A", ARE SOLD FOR $200,000.00 OR MORE, THIS PROMISSORY NOTE SHALL BE NULL AND VOID. IN ADDITION TO THE FOREGOING, IF SUCH LOTS ARE SOLD FOR MORE THAN $200,000.00[,] MAKER SHALL BE ENTITLED TO RETAIN ALL NET PROCEEDS IN EXCESS OF $200,000.00.**

18

Demetrius testified that the two lots referred to in the promissory note comprised the Trinity Hughes property and that he and Johnny included this provision as part of their negotiation process. Elder testified that he drafted the $25,000 promissory note from Demetrius to Johnny, that the paragraph in bold, capitalized letters was something that Demetrius and Johnny had agreed upon, and that he was instructed to put the paragraph in the note. Elder stated that he was not acting as attorney for either side when he drafted the note but rather just as a closing agent for that transaction.

At trial, Johnny claimed that the promissory note was due.[10] Johnny also testified that he was not familiar with the note's bolded, all-caps paragraph and that, prior to signing the note, he was never told about the property's April 2002 appraisal. Johnny also stated that although he signed and approved the note, he did not remember reading it. With regard to documents that he signs, Johnny

---

[10]The September 21, 2004 minutes from JPD Guam's shareholders' annual meeting were admitted in evidence and reflect that

> The commercial lot of approximately 11 acres in Wichita Falls, Texas sold for $75,000[,] of which $50,000 was received in December 2003, the balance of $25,000 was loaned to Dee Reyes. Dee said he needed to borrow the money and will pay it back in six months. To date, Dee Reyes has not paid back the money per agreement. Johnny Reyes to follow-up on status of payment.

They also show that Johnny was still president, Kathrina was still secretary, Daniel Reyes was still present by proxy, and the share distribution remained the same as 2002 and 2003.

stated, "They just put it in front of me and I trust my people that are doing it so I just sign it." He clarified that "they" meant his employees.

## 4. Events in 2004

At Elder's office on October 20, 2004, JPD Guam sold some property to BCI, Demetrius sold his RUCR property to BCI, and Demetrius purchased the Trinity Hughes property from JPD Guam.

### a. BCI Property Transactions

Demetrius testified that he was contacted about the property BCI wanted to purchase and that he contacted Johnny and told him what BCI wanted to buy. He stated that he did not try to acquire JPD Guam's land to sell to BCI, that JPD Guam sold its land to BCI directly, and that Johnny was fully involved in the process.

Tim Chase, the president of the Wichita Falls Chamber of Commerce and Industry (formerly BCI), testified that he had no dealings with either Johnny or Demetrius other than the purchases of their tracts of land. Chase was unsure exactly with whom he had dealt, stating, "You know, I'm not even sure if it was Johnny or who, it was just the Reyes family was involved with the sale of the land. I'd have to look back through the records to see the name specifically of the people involved."

On March 24, 2004, Johnny, on behalf of JPD Guam, executed an earnest money contract with BCI for 8 acres for $115,000. Paragraph 24 of the earnest money contract, entitled "Adjacent Property," contains the following:

20

Concurrently with the submission of this Contract by Seller to Buyer, *Buyer has submitted an earnest money contract to Demetrius A. Reyes and Darlene P. Reyes, (the "Adjacent Owner") relating to the purchase of 36 acres, more or less, located adjacent to the Property (the "Adjacent Property")*. Buyer's purchase of the Adjacent Property is essential to the Buyer's proposed use of the Property, and Buyer does not intend to purchase the Property unless Buyer is able to purchase the Adjacent Property at or near the same time. [Emphasis added.]

On May 27, 2004, BCI sent Demetrius a letter referencing their March 15, 2004 earnest money contract and stating that an environmental site assessment raised some concerns and that it would exercise its right to terminate the contract subject to remediation. On the same day, BCI sent JPD Guam a letter referencing their March 24, 2004 earnest money contract, which included the same environmental site assessment and remediation language.

Kathrina testified that in June 2004, she and Johnny asked Demetrius what was happening with the sale to BCI and that he told them that it was on hold pending an environmental study. Kathrina said that Demetrius asked them "to go in half and half on the expenses" for the environmental cleanup. Kathrina said that they also asked Demetrius about the acreage involved, because the contract they received listed 8 acres, and they thought they only had 6 acres to sell. Kathrina said that Demetrius avoided answering that question.

21

Demetrius testified that because of BCI's environmental concerns, he had to clean up the property, including having the property surveyed.[11] BCI reinstated both Demetrius's and JPD Guam's contracts in July 2004, and both contracts closed on October 20, 2004.

### b. Trinity Hughes Transactions

In mid-to-late summer 2004, Lilley (Trinity Hughes's CEO) and Demetrius negotiated over the Trinity Hughes property. Lilley testified that Demetrius never provided him with proof that he owned the property or talked with him about who owned it. On May 5, 2004, Demetrius (d/b/a Short Skirts Management and Holdings, L.L.C. (Short Skirts)) agreed to sell 18.2 acres "more or less" to Trinity Hughes for $588,000, with a closing date of July 23, 2004.[12]

Demetrius testified that he called Johnny, told him that he had a possible buyer for the property, and discussed a $200,000 price with him but that Johnny wanted more. They negotiated back and forth until they could agree on a cash purchase of $207,000 between Demetrius and Johnny. On May 14, 2004, Johnny, on behalf of JPD Guam, signed a contract with Demetrius for $207,575 for the Trinity Hughes property, to close July 23, 2004. Demetrius said that he had expected his closing with JPD Guam and his closing with Trinity Hughes to

---

[11]Probst testified that he surveyed both parcels of land for the BCI sales. Demetrius's property contained 32.198 acres (31.779 net), and JPD Guam's property contained 7.010 acres (6.541 net).

[12]Trinity Hughes's October 20, 2004 certificate of resolution shows that it resolved to purchase 11.752 acres and 5.77 acres for $588,000.

both occur in August but that Trinity Hughes had problems with its financial backers and postponed closing.

Johnny testified that, as before, Demetrius called him and told him that he was negotiating a deal to sell the property, this time, to a California company, and that Johnny agreed to the same 10% finder's fee. Johnny said that Demetrius told him that the property's market value was $200,000 to $250,000. When Johnny and his family lived with Demetrius during June 2004, Demetrius never mentioned the April 2002 appraisal or his agreement with Trinity Hughes to sell the property for $588,000.

Demetrius's notes were admitted in evidence; the notes are undated, and Demetrius indicated that some of the writing is not his. The notes have two prices lined out, "Sale Price $238,500," and "Contract Price $213,500," before $207,575 is left unlined on the same line as "Contract Price." The following figures listed on the page reveal how the $207,575 was calculated:

238,500

-11,925  COMM

-25,000  DEE

+6,000 EARNEST/OPTION

207,575

-?  CLOSING COST

23

$11,925 is 5% of $238,500; Demetrius testified that the $11,925 might be the realtor commission and that the $25,000 is "the promissory note."

On June 28, 2004, Elder's office sent to the title company a letter that attached copies of the settlement statement, an affidavit to debts and liens, and the warranty deed for the Trinity Hughes property and included the following statement:

> It is my understanding that Demetrius Reyes is selling this property on July 23, 2004 and this closing is supposed to happen at the same time. Demetrius Reyes has asked that Guarantee Title cut a check to Fudge and Elder for $206,776.93 and we will disburse the funds as described on the Settlement Statement enclosed. We will forward a filestamped photocopy of the Warranty Deed once it has been recorded.

The attachments were not included in the exhibit admitted at trial. Thompson signed the letter. However, Demetrius and JPD Guam amended their sales contract on July 22, 2004, to reflect a higher price of $211,575, with a new closing date of September 23, 2004.

The warranty deed from JPD Guam to Demetrius was filed on July 29, 2004.[13] An additional warranty deed, from Demetrius's transfer of the Trinity Hughes property to Short Skirts, was filed on the same day. Elder testified that Thompson handled the closing and filed the documents at Demetrius's instruction. Thompson testified that Demetrius instructed her to prepare the

---

[13]Elder stated that it was extremely unusual to file a warranty deed before closing and that it probably should not have been done in this transaction "except for what had gone on in the past with Dee coming in and telling us what he and Johnny had talked about and done and do this."

24

deeds—which she did—and that Demetrius told her to file them, which she filed simultaneously. Thompson brought the situation to Elder's attention after Demetrius's check for the filing fees bounced, and at some later point, Elder told her not to prepare any more deeds without his review. Thompson testified that she never received any instructions from Johnny.

Demetrius testified that although the settlement statement between JPD Guam and Demetrius shows that they closed on July 23, 2004, they actually closed on October 20, 2004. Elder stated that Demetrius could not buy the property on July 23 because he did not have the money for it.

The September 21, 2004 minutes from JPD Guam's shareholders' annual meeting, which were admitted in evidence, state,

> The President informed the stockholders that he entered into a verbal agreement with Dee Reyes, nephew, to sell the Corporation's commercial lot of approximately 17 acres to Trinity Hughes for $211,575. Dee Reyes suggested the fair market value is between $200,000 and $250,000. The tax roll showed an assessment value of $101,430. Closing on July 23rd did not materialized [sic] but was extended to September 23, 2004.

Johnny said that the sale from JPD Guam to BCI was not included in the minutes because he did not know at the time if the sale would go through. He attempted to explain why Trinity Hughes was mentioned in the minutes, stating that although he did not know that it would be sold to Trinity Hughes,

> This is—when—when this started out, when they were gonna close, I don't know who it is. And when it is Trinity Hughes, we—we—we have our meeting in September and say, you know, that probably it's Trinity Hughes because Dave Lill[e]y was Trinity Hughes. But we're

25

not sure so I'm putting in Trinity Hughes so that—to tell us that that's the name of the company. We don't know who it's gonna be.

Johnny acknowledged that JPD Guam's sale to BCI and the third sale were in the same status at the time, i.e., waiting to see if everything could be done to close them.

In a letter dated September 20, 2004, Elder informed Lilley that his firm had been retained to represent Demetrius with regard to the earnest money contract, that Demetrius expected Trinity Hughes to close on the eighteen acres under contract, and that failure or refusal to close would "cause [Demetrius] to lose the property and any profit that he would have made on the sale" because Demetrius's "interest in the property will be forfeited by him if this closing does not occur by September 23, 2004." In a letter dated September 22, 2004, Lilley stated that Trinity Hughes still wanted to come to terms on the eighteen acres under contract but had not received a response about its desire to renegotiate some terms of the original contract. JPD Guam and Demetrius did not amend their contract again when the September 23 closing date passed.

### c. October 2004 Closings

On October 20, 2004, Demetrius sold a 31.779-acre tract to BCI for $205,000, and JPD Guam sold to BCI a 6.541-acre tract for $115,000.[14] The closings took place at Elder's office.

---

[14]The minutes of the JPD Guam board of directors meeting show authorization to sell 6.541 acres of real property to BCI for $115,000, signed by Johnny on October 20, 2004.

Kathrina testified that she was at the BCI closings and described the following:

> When we first arrived there, they were working on closing the BCI deal with Demetrius Reyes. So we just sat there at the table and we just waited until they did their closing with Demetrius Reyes. And then after the closing, they turned it over to us. And my husband just signed whatever papers they wanted him to sign for the closing with BCI.

> Then Demetrius—we stood up, and Dave Lill[e]y and another one of his associates—I don't really know who he is, but other two people with him, they got up and they walked over to a separate room. We were in the main area of Billy's—I don't know what they call it—common area—and they were walking into a separate room, and Dee stood up and said to us, I will handle everything from here. Just wait for me out here.

> So I looked at my husband and I said, you know, aren't we going to go in there? And he just looked at me and said that's okay. . . . So we sat back down and we waited, and then in about five minutes he came out and he handed us a check—two checks, in fact. One was for the BCI, and the other one was for the down payment. And then he walked us out the building, and, you know, he even walked us out to our car. And, you know, and he says, you know, I'll take care of it. And that was it.

Demetrius testified that he salvaged the sale to Trinity Hughes by financing it himself, that Johnny financed the sale of the land to him, and that Demetrius's out-of-pocket costs were almost $50,000.[15] Johnny demanded 20% down and 8.5% interest to finance the sale to Demetrius, so for Demetrius to close the Trinity Hughes deal, he had to first obtain cash from his BCI sale. On October 20, 2004, a check made payable to "JPD Guam Company, Inc. and/or Johnny C.

---

[15]The exhibits show that JPD Guam financed $169,260 of its sale of the Trinity Hughes property to Demetrius and received a "note secured by collateral transfer of note and lien" for $169,260.

27

Reyes" was written on Fudge & Elder's escrow account for $41,066.93, "for proceeds from 7/23/04 closing"—referencing the original closing date of the JPD Guam-Demetrius sale. Elder testified that this check was the proceeds from the sale of the Trinity Hughes property from JPD Guam to Demetrius.

A collateral transfer of note and lien dated October 20, 2004, shows that Demetrius was indebted to JPD Guam for $191,575, that a $580,000 note executed by Trinity Hughes was collateral for Demetrius's debt, and that the debt was on 17.522 acres. The collateral transfer of note and lien document was subsequently amended to change the debt amount from $191,575 to $169,260, and to reflect that the debtor was Short Skirts, not Demetrius. Demetrius testified that he never sent either the original collateral transfer of note and lien or the corrected one to any representative of JPD Guam and that he did not know if Johnny or anyone at JPD Guam received them. However, he also testified that he expected the collateral transfer of note to be presented to JPD Guam and that he never conspired with Elder to hide it or anything else from Johnny or JPD Guam.

Elder described his conversations with Demetrius and Johnny about the Trinity Hughes property as follows:

> Well, as I understand it, Dee was saying that he made a deal to buy the properties at [$]211,575 and that deal was made back in June. Dee was not able to come up with the cash to close it. And part of the reason was because what he had sold it for, they were supposed to pay cash, couldn't come up with the money. . . . And I had several conversations with Dee about, well, do I still sell it to these guys because it's too good of a deal not to sell it to them. And my

28

response to him was owner finance it. That way you've at least got the property. If they don't pay you, you get the property back. But that's a good price to sell it for.

But Dee was taking the position from back in June that he'd made the deal with JPD for $211,000. Well, he didn't get the money to pay the $41,000 on the property until he closed on the transaction and JPD closed on the transaction with BCI which, if you'll notice, took place on or about that same day in October.

And so there was—there was a lot of haranguing and going back and forth that Dee and Johnny had between June and October because Dee couldn't come up with the money and he was supposed to. And so how many times the deal changed, I can tell you it changed all the way up until the day—October 20th, the day they signed this. We made changes to the papers and that's why some of these had to be corrected is because it was such a rush job that they wanted changes made that day on October 20th. So the deal was changing all the way up till October 20th.

Now, did—did Johnny know what Dee had sold it for to Trinity Hughes? I have no idea if he knew back in June or July when Dee made the deal with him to sell it to him for 211. But on October 20th, that day he knew . . . because he got a Collateral Transfer of the note and Deed of Trust as collateral. . . . I discussed it with him in detail and distinguished the difference with—the difference between a Deed of Trust and a Collateral Transfer of Note and Lien because Johnny kept saying, well, I'm going to have a lien on this property. And my response to him and continued to be at closing, Johnny, you're gonna have a lien on the note, not the property. But if they don't pay the note, then you will have in a round about way a lien on the property. And we discussed that in detail . . . on the 20th.

Johnny testified that he never received a copy of either the collateral transfer of note or corrected collateral transfer of note and that neither he nor Kathrina was ever told of the $588,000 sale to Trinity Hughes. Johnny denied that Elder ever went over the collateral transfer of note with him and stated that he never saw it before 2005. Kathrina stated that the closing took no more than

29

thirty minutes, that there was no closing for JPD Guam with regard to 18 acres on October 20, 2004—the approximate amount of property in the Trinity Hughes sale—and that Elder never discussed the collateral transfer of note with them.

Elder testified that the closing between Demetrius and Trinity Hughes did not occur until October 21, 2004, and the deed of trust between Demetrius (as Short Skirts) and Trinity Hughes shows that it was not signed until that day. Trinity Hughes's $580,000 note is dated October 20, 2004, but it does not indicate when it was signed. Elder testified that the deed of trust and note would have been signed at the closing on October 21, 2004. Johnny testified that he was not in the same room when the Trinity Hughes documents were being signed.

## 5. Events of 2005

Johnny had knee surgery in November 2004; Kathrina was in charge of JPD Guam while he was recuperating. Demetrius testified that about six months after the Trinity Hughes property closed, Kathrina called him, wanting to renegotiate. Johnny testified that around February or March 2005, he mentioned to Kathrina that they had not received any money or documents, and she called Elder to find out what was going on. Kathrina said that Elder gave them the documents in March and that Elder's office staff claimed that they had not known

where to send the documents, even though Johnny had left a forwarding address in Guam.[16]

Kathrina testified that she and Johnny called Elder because they wanted to know "what was going on with the properties," and when they arrived at Elder's office, she asked him for the closing documents for the sale of JPD properties. Kathrina stated that the first time she learned of the $580,000 sale was when she asked Elder about the closing documents. However, on cross-examination, Kathrina admitted that, in the chronology that she had prepared in October 2005 and produced during the course of the litigation, she noted that Johnny learned of the $580,000 sales price on October 20, 2004.

Elder testified that in 2005, he became aware of the controversy with regard to the Trinity Hughes property in connection with an income tax question by Johnny and Kathrina. He stated that Johnny and Kathrina's copies of the documents, "a set of documents which included all the Collateral Transfers and everything," were sent to Guam and that Johnny and Kathrina did not make any complaints to him about the transactions involving the BISD or SKB properties.

---

[16]Norma Toliver, the chief deputy in the Wichita County Clerk's Office, testified that her records showed that a transfer of deed of trust was recorded on October 26, 2004, from Demetrius A. Reyes to JPD Guam Co., Inc., and returned to Johnny Reyes in Tamuning, Guam. Her records showed that the document was mailed from the clerk's office to Guam on November 8, 2004, and she stated that there were no notations in her system to show that the postal service returned it to the clerk's office. Kathrina testified that the clerk mailed the document to suite 102 but that the correct address was suite 101. Suite 102 is down the hall from suite 101.

On May 6, 2005, Kathrina, on Johnny's and JPD Guam's behalf, sent a letter to Trinity Hughes, LLC, informing Trinity Hughes that JPD Guam was invoking section D.2.a. of the October 20, 2004 collateral transfer of note and lien and wanted all payments sent directly to Johnny, with all checks made payable to "JPD Guam, Inc. and/or Johnny C. Reyes." However, as of May 6, 2005, Demetrius was not in default to JPD Guam. Lilley testified that prior to receiving JPD Guam's demand letter, he was unaware of JPD Guam's claim to the sale proceeds.[17]

The trial court admitted in evidence Elder's July 26, 2005 letter to Johnny, Kathrina, and Demetrius, in which Elder informed them that his firm could no longer represent JPD Guam or Demetrius due to their conflict; that, until March 8, 2005, when Kathrina and Johnny came to his office, he was unaware of any conflict; and that, in May 2005, it became clear that no agreement or compromise in settling the dispute was possible. Elder then set out his understanding of the events precipitating the dispute:

> It is my understanding that Dee takes the position that he negotiated a sales price on the purchase of the 11.752 acre tract and the 5.77 acre tract from JPD for the cash purchase price of $211,575.00. This was negotiated in April or May of 2004. We were instructed by Dee to prepare a cash deed which was given to Johnny, who signed it and returned it for filing. Title was then transferred from Dee to his company, Short Skirts Management and

---

[17]In April 2005, Lilley sent a letter to Elder referring to Demetrius as Elder's client and stating, "[W]e continue to honor the commitment we made to your client to vigorously work to sell and/or develop 18 Acre [sic] to each of our benefit."

Holdings, LLC.  At no time were we ever instructed to hold either Deed in escrow.

When Dee discovered that Trinity Hughes could not obtain the necessary financing and its financial backer withdrew, it was necessary for Dee to renegotiate his agreement with JPD because he would not have the cash to purchase the property outright.  I do not know what conversations took place during this renegotiation period, but I do know from conversations with Johnny that if Dee paid at least 20% down, JPD would finance the balance.   The closing statement shows July 23, 2004, for the effective date of sale, but it was not finally consummated until October when Dee actually had the money to pay the 20% down and had closed on Short Skirts' sale of the property to Trinity Hughes.

Since the property had already been placed into the name of Dee and then from him into Short Skirts by cash deeds, filed in July of 2004, it was necessary to secure JPD's note with the Trinity Hughes Note and Deed of Trust.  All of which was done as evidenced by the endorsement of the Note and the Collateral Transfer of the Trinity Hughes Note and Deed of Trust.  If Dee were trying to hide the value of the Trinity Hughes sale, it certainly was not reasonable for him to pledge such note as collateral.

It is my understanding that JPD has taken the position that Dee was their agent and as such should have obtained the best price possible.  JPD claims that Dee is the one [who] set the value of the property at $211,000.00, and thus the reason the property was sold to him for that price.  *When the principals in Guam discovered from the Collateral Transfer that Dee had resold the same property for $580,000.00, they became disgruntled because he was only given the authority to make a $100,000.00 profit rather than $368,425.00 profit.  I do not know what knowledge Johnny had as to the amount of profit being made by Dee, but I do know that he was present at the signing of the HUD-1 in October of 2004.*  [Emphasis added.]

Elder testified that "the $100,000 that Johnny had said was okay for Dee to make on the deal was considerably more than what a normal realtor would

make," and he stated that in one of the earlier transactions, he made a comment to Johnny that Demetrius was "flipping" the properties.[18] Elder testified,

> And I had a personal conversation with Johnny to let him know that he was flipping these because I wasn't going to be a party to simultaneous closing where two clients are sitting there and one is making a huge profit while the other one doesn't know about it.
>
> And Johnny's response to me was, well, he's making a little bit more profit, I'm just trying to help him get started in business. And from that point on, I didn't question when Dee came in and said, I've talked to Johnny and this is what we're gonna do. I just assumed that Dee was speaking for Johnny then.

Elder stated that this conversation took place in or around 2002, the first time that he was involved in a transaction between Johnny and Demetrius.

Elder testified that he had always been under the impression that Johnny owned 100% of JPD Guam based on what Johnny had told him but that when the Trinity Hughes documents reached Guam, Johnny and Kathrina were asked questions about the profit between Demetrius's sale to Trinity Hughes and the sale from JPD Guam to Demetrius. The big issue for Kathrina and Johnny was whether it looked like Johnny was getting a kickback from Demetrius, not whether the documents had ever been sent. Elder stated,

> And, in fact, I prepared an affidavit on one closing for the BCI closing for Dee to sign and send back to JPD Guam to explain to my

---

[18]Elder explained that what he called "flipping" was Demetrius buying property, waiting for it to close, and using the money he sold it for to close the first transaction, and he said that he would not participate in flipping-type transactions unless everyone knew what was going on, which is why he told Johnny that Demetrius was flipping the properties "and selling them for considerably more than what he [was] buying them from [Johnny] for."

34

knowledge there was not one. And Dee's affidavit said that there was not one and explained the reason why there was a $65,000 fee on the BCI closing.[19] And that seemed to satisfy that—on that closing.

But then the question arose at tax time back in April or so of '05 when whoever it was back in JPD saw this large sale because they looked at the Collateral Transfer documents and could see that the collateral for the $169,000 note was a $580,000 note which would clearly indicate it sold for a whole lot more. . . .

But Johnny knew that in October. He knew that. We went over that in detail because I had to explain to him why he wasn't getting a Deed of Trust on the property, he was getting a note secured by Collateral Transfer.[20]

---

[19]Elder referred to a $65,000 "commission" that Demetrius received, but he noted that Demetrius was not a licensed real estate agent at the time of this sale. The BCI-JPD Guam settlement statement reflects that the sale price to JPD Guam was $115,000 but with a $65,000 "Total Reduction Amount Due to Seller." Demetrius testified that because of BCI's environmental concerns, he had to clean up the property, including getting a backhoe to dig ditches to prove there was not a trash dump underneath, and that he had to have the property surveyed. The record does not reflect what Demetrius had to pay for these activities.

[20]Elder elaborated, stating,

Well, Johnny—Johnny seemed to want to make sure he had a lien on the property. He kept asking—if he asked that once, I bet he asked it three times. I'm gonna have a lien on this property. And I'd have to go back and say every time, no, Johnny, you're gonna have a round-about lien, but you're not gonna have a lien on the property itself. What you're gonna have a lien on is a note. Now, that note is secured by a lien on the property.

And I went through this and I could tell that he really wasn't understanding because I had to explain it to him more than once. And I'm not sure—to be quite honest with you, I'm not sure he really ever understood what I was trying to tell him. But there's a big difference between taking a lien on real estate and taking a lien on a note secured by real estate. But that was how that transaction changed from June to October.

35

. . . My belief is [Johnny] had no idea until October 20th until we went into that closing because he acted at that point like he didn't know it was selling for so much. And I could tell he didn't like it at that time, but he went ahead and closed on it because he said that's what he had agreed to on this. But—but he knew on October 20th. Now prior to that, I don't know [sic] think he knew is my opinion.

Elder testified that his usual practice in conducting real estate closings was to use the earnest money contract as a roadmap to the closing. However, according to Elder,

> from the very beginning Dee would come in and say, this is what I'm gonna do, send a deed to Johnny, he'll sign it and send it back to you. I've already talked to him about it. Well, we did this for probably two years. And I don't know how many transactions took place in that regard but that was the normal transaction with them.

Elder stated, in both his letter and at trial, that he thought the parties' memorandum of understanding (MOU) fairly resolved the differences between the parties but that he was not sure whether it had been fully agreed to in any particular form. The trial court admitted the MOU as Plaintiff's Exhibit 12 for the limited purpose of construing the document, but it admitted the MOU as Defendant's Exhibit 9 without any limitation.

The MOU memorializes that on July 23, 2004, Demetrius purchased the Trinity Hughes property from JPD Guam for $211,575, with JPD Guam financing $169,260; that Demetrius transferred the property to Short Skirts, which then sold

---

Elder explained that what Johnny did not understand was the distinction between a lien on real estate and a lien on a note secured by real estate but that Johnny finally understood that he was getting collateral for his note and that it was in some way related to that land.

36

the property to Trinity Hughes for $588,000 and assigned to JPD Guam the note and lien as collateral for the $169,260 loan; and that the parties agreed to renegotiate to establish a different value for their interests in the Trinity Hughes property and note. The MOU then contains the following terms of the renegotiation:

1. REYES agrees to endorse the TRINITY Note outright [(]and not as collateral) to JPD, save and except a twenty per[cent] interest therein, which shall be retained by REYES. In exchange for such interest, the Reyes Note to JPD shall be forgiven.

2. In the event TRINITY pays such Note and does not default under the terms of the Note and Deed of Trust, REYES shall receive Twenty Six and Three tenths Per Cent (26.3%) of each Note payment (principal and accrued interest) made and JPD shall receive the remainder of each note payment made, being Seventy-three and Seven Tenths Per Cent (80%) thereof.

3. In the event TRINITY defaults, a foreclosure becomes necessary and JPD acquires title at foreclosure, it is agreed and understood that:

   A. The title to the property shall be reconveyed to REYES, subject to a Real Estate Lien Note payable to JPD in the amount of $169,200.00 amortized at 8.5% over 15 years, secured by a Deed of Trust containing a provision that REYES shall be prohibited from using the property as collateral for any indebtedness other than the debt owed to JPD. In addition to the debt, Reyes shall be liable to JPD for a prepayment penalty of 15% of the selling price from REYES to any other party, if the property is sold by Reyes within 5 years from the date of the note.

   B. REYES shall not receive the return of his down payment of $41,534.93.

   C. REYES may pursue TRINITY for any damages incurred by REYES as a result of its default, one-half (1/2) of which shall be paid to JPD upon request.

37

Demetrius testified that there was agreement on some parts of the MOU, that he signed it on April 22, 2005, and that the MOU was the result of "constant pressure from Kathrina and [his] uncle." Demetrius testified that, under the April MOU, he would be released from the "160 something thousand" that he owed JPD Guam, that he would not be entitled to his 20% earnest money, and that the MOU would be a settlement of all claims.

After Demetrius signed the MOU on April 22, 2005, JPD Guam proposed other versions of the MOU. Demetrius testified that he did not agree to the May 6, 2005 MOU (Defendant's Exhibit 10) in which Kathrina had tried to change his indebtedness from $169,200 to $191,575. Kathrina testified that Demetrius orally agreed to the change, which she made on May 5, 2005.

Johnny acknowledged that he told Elder that his investors were unhappy when they learned of the terms of the $588,000 transaction. However, he also testified that JPD Guam's shareholders were himself, Kathrina, his son, and one of his other nephews. Johnny stated that there had been other investors in JPD Guam in the past but not from 2000 to 2009, then corrected himself, stating that Teker, JPD Guam's secretary, had one share. Johnny also testified that the distribution of shares as reflected in the 2002, 2003, and 2004 minutes was correct. The investors he referred to as being unhappy were "[t]he whole family."

Demetrius testified that prior to March 2005, no one from JPD Guam complained about his purchase price from JPD Guam for the Trinity Hughes

property. With regard to all three sales from JPD Guam to Demetrius, Demetrius testified:

Q. JPD received 55,000 on the first sale; is that correct?

A. Yes.

Q. 50,000 on the second sale?

A. Yes.

Q. And 211,000 on the third sale?

A. Yes.

Q. For a total of 311,000?

A. Yes.

Q. Which is almost 140,000 more than what they agreed to sell it to you earlier?

A. Yes.

Q. And that sale would also include the land that went to BCI?

A. Yes.

Q. So in regard to these transactions that closed in 2002, 2003, 2004, JPD came out with more money than they would have had you bought the land back in 2002?

A. Yes.

Johnny acknowledged that Demetrius was the grantee on all of the deeds he issued, but he claimed that he did not intend to sell any of the property to

39

Demetrius. Johnny admitted that he did not have any documents to show that JPD Guam did not intend to sell the three properties to Demetrius.[21]

## D.  Analysis

JPD Guam argues that the great weight of the documentary and testimonial evidence establishes that the parties entered into a consensual agreement under which Demetrius would act on JPD Guam's behalf in locating buyers for JPD Guam's properties and in making arrangements for the sale of these properties to such buyers under JPD Guam's direction and control.  In support of its argument, JPD Guam points us to four items of evidence:

- The $25,000 promissory note from Demetrius to Johnny made in their SKB property transaction, which states that the note will be forgiven if the Trinity Hughes property sells for over $200,000;

- Demetrius's testimony that he called Johnny to tell him that he had located "a possible buyer" for the Trinity Hughes property;

- Norseworthy's and Elder's testimonies with regard to Demetrius "speaking for" Johnny; and

- The MOU provisions that entitle Demetrius "only to an interest and commission payment equal to approximately 26% of the entire value paid by Trinity Hughes" and that limit Demetrius's ability to recover in the event Trinity Hughes defaults.

Demetrius responds that all of the documentary evidence supports his position, that the three transactions were just a continuation of prior purchase

---

[21]Demetrius is not the only family member who Johnny has sued in a land dispute.  Johnny sued his daughter Velma for "cheating" him.  He issued a warranty deed to Velma in her name and told her not to file it until he died.  She ignored his instructions and filed the deed, and he disowned her.

agreements between Demetrius and Johnny, and that the testimonial evidence boils down to a "swearing match" between the parties.

We first note that "[t]he critical element of an agency relationship is the right to control, and the principal must have control of both the means and details of the process by which the agent is to accomplish his task in order for an agency relationship to exist." *McAfee, Inc. v. Agilysys, Inc.*, 316 S.W.3d 820, 829 (Tex. App.—Dallas 2010, no pet.) (stating that the "mere fact that one party to a relationship subjectively trusts the other does not indicate the existence of a fiduciary relationship"). The documentary evidence and testimony, as set out in extensive detail above, supports the trial court's findings that Demetrius was not JPD Guam's or Johnny's agent and that a fiduciary relationship did not exist between them: Nothing in the record demonstrates that JPD Guam controlled the prices that Demetrius charged BISD, SKB, or Trinity Hughes for the land Demetrius sold to those entities or that JPD Guam told Demetrius how to sell the land to those entities. *See Seaway Prods. Pipeline Co. v. Hanley*, 153 S.W.3d 643, 651 n.10 (Tex. App.—Fort Worth 2004, no pet.) (describing the "right to control test," under which a court examines whether the alleged principal had the right to determine the details of the agent's work in determining whether an individual is an agent or actually an independent contractor). Rather, Demetrius initially placed all of the land under contract with Johnny and then began marketing it, paying to have it appraised prior to the expiration date of the first earnest money contract with JPD Guam. Johnny did not tell Demetrius to have

41

the land appraised; rather, Johnny testified that he did not know anything about the appraisal.

Further, the documentary evidence reflects that JPD Guam sold all three properties at issue directly to Demetrius, who then sold the properties to the third parties at a profit, and both Lilley—who participated in two of the transactions— and Taylor testified that they believed they were dealing only with Demetrius. *Cf. Fryer*, 227 S.W.3d at 353 (describing apparent authority as acts of participation, knowledge, or acquiescence by the principal that clothe the agent with the indicia of authority in the agent's transactions with third parties).

And although the debt forgiveness language in the promissory note requires the Trinity Hughes property to sell for more than $200,000, all this reference clearly shows is that Johnny wanted at least $200,000 for that land (and for which price he subsequently contracted with Demetrius—first for $207,575 and later for $211,575 when closing was delayed). The note's language is not inconsistent with Demetrius's theory at trial that the considerably-more-experienced Johnny wanted to help Demetrius get started in business. Demetrius testified that he and Johnny included the language in the note in their negotiations, that when he found a possible buyer for the Trinity Hughes property, he called Johnny and told him, and that they agreed on a cash purchase of $207,000 by Demetrius from JPD Guam.

Additionally, Norseworthy's testimony—as set out above—was ambiguous, showing that he really had little idea if Demetrius had ever represented Johnny,

particularly when he stated that he thought Demetrius had represented Johnny when RUCR owned the property. In contrast, the documentary evidence showed that Demetrius tried repeatedly to acquire all of the property at issue, first from RUCR (as opposed to representing RUCR) and then from Johnny and JPD Guam. And with regard to Elder's "speaking for" testimony—which is set out in its entirety above—this testimony was also ambiguous in that immediately before this statement, Elder said that he told Johnny that Demetrius was flipping the properties and that Johnny told him that he was trying to help Demetrius get started in business. Demetrius testified that he was not acting as Johnny's or JPD Guam's agent, and Johnny testified that Demetrius was; the trial court was the sole judge of their credibility and the weight to be given their testimonies. *See Golden Eagle Archery,* 116 S.W.3d at 761.

Finally, while the MOU provisions—had they been accepted by both parties—would have limited Demetrius's profit, they also set out a recitation of the facts that is consistent with Demetrius's theory: Demetrius purchased the Trinity Hughes property from JPD Guam for $211,575 with JPD Guam financing $169,260, and Demetrius transferred the property to Short Skirts, which then sold the property to Trinity Hughes for $588,000 and assigned to JPD Guam the $580,000 note and lien as collateral for the $169,260 loan. The MOU contains nothing about Demetrius acting as Johnny's or JPD Guam's agent in this transaction. Having reviewed the entire record, we conclude that Johnny and JPD Guam have failed to show that the trial court's no-agency finding is against

43

the great weight and preponderance of the evidence.  And the credible evidence supporting the finding is not so weak, or so contrary to the overwhelming weight of all the evidence that the finding should be set aside and a new trial ordered. *See Gonzalez*, 195 S.W.3d at 681–82; *Cropper*, 754 S.W.2d at 651; *Pool*, 715 S.W.2d at 635.  We overrule Johnny and JPD Guam's sole issue.

## IV.  Conclusion

Having overruled Johnny and JPD Guam's sole issue, we affirm the trial court's judgment.

BOB MCCOY
JUSTICE

PANEL:  LIVINGSTON, C.J.; MCCOY and GABRIEL, JJ.

DELIVERED:  July 21, 2011